AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

249 11th Street NE, 2nd Floor, Washington DC

### APPLICATION AND AFFIDAVIT
### FOR SEARCH WARRANT

CASE NUMBER:

(Further described below)

I ___Daniel W. Spotts_____ being duly sworn depose and say:

I am a(n) ___Special Agent of the Federal Bureau of Investigation,_____ and have reason to believe
(Official Title)

that  (name, description and or location)
within the premises of 249 11th Street NE, 2nd Floor,

in the District of Columbia, there is now concealed a certain person or property, namely  (describe the person or property to be searched)
See Attachment A

which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)
evidence of money laundering and unlicensed monetary transmissions, in violation of 18 U.S.C. Sections
1956(a)(3)(B), 1956(h), and 1960(a).

concerning a violation of Title 18 U.S.C.  United States Code, Section(s) 1956(a)(3)(B), 1956(h), and 1960(a) . The
facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN

Continued on the attached sheet and made a part hereof.

Amy Jeffress
National Security Section                          _____
(202)202-514-7624                                 Signature of Affiant Daniel W. Spotts, FBI

Sworn to before me, and subscribed in my presence

_____            at Washington, D.C.
Date

_____            _____
Name and Title of Judicial Officer              Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

_____Your Affiant, Special Agent Daniel W. Spotts of the Federal Bureau of Investigation (FBI),

deposes and say as follows:

1.    Your Affiant is a Special Agent with the FBI.  He has been a sworn member of the

FBI since 1994 and is currently assigned to the FBI Salisbury Resident Agency in Salisbury,

Maryland.  During that time, your Affiant has attended and successfully completed basic agent

training at the FBI Academy in Quantico, Virginia.  The training at the Academy consisted of both

classroom instruction and practical exercises dealing with all facets of criminal violations, including

white collar crime.  Throughout the course of his law enforcement career, your Affiant has conducted

and/or participated in numerous white collar crime investigations, to include money laundering

matters, as well as the preparation and execution of document search warrants.

2.    On August 29, 2007, a federal grand jury returned a sealed superseding indictment

charging six  defendants, all of whom are Pakistani nationals, with money laundering and conspiracy

to do same in violation of 18 U.S.C. §§ 1956(a)(3)(B) and 1956(h).  The named defendants included

Saifullah Anjum RANJHA, Muhammad Riaz SAQI, Imdad Ullah RANJHA, Mazhar Iqbal

CHUGHTAI,  Anar MUHAMMAD, a/k/a Akthar Ali, and Parvez Mehmood SANDHU.  Saifullah

RANJHA's money transmission business known as HAMZA, INC., d/b/a Pak American Money

Transfer, was also indicted in the money laundering conspiracy charge.  Saifullah RANJHA and

Imdad RANJHA were charged with operating an unlicensed money transmission business in

violation of 18 U.S.C. § 1960(a).  Saifullah RANJHA was also charged with concealment of terrorist

financing in violation of 18 U.S.C. §§ 2339C(c)(1)(A) and (c)(2)(A), and failure to file currency

transaction reports in violation of 31 U.S.C. §§ 5313(a) and 5322(b).  CHUGHTAI is a Canadian

resident. MUHAMMAD and SANDHU reside in Spain.  The superseding indictment remains sealed

pending the defendants' arrests and conclusion of the investigation.

3.      The charges in this case arose from an ongoing sting investigation utilizing a cooperating witness.  Between December 2003 and the present, the CW, acting at the direction of agents with U.S. Immigration and Customs Enforcement ("ICE") and the FBI, provided a total of approximately $2,208,000 to Saifullah RANJHA (hereinafter "S. RANJHA") and his codefendants for the purpose of transferring the monies abroad through the "hawala" method of currency transfer.[1] The CW represented himself to be involved in numerous illegal activities, including: international smuggling of counterfeit cigarettes and other goods and contraband, including weapons; large-scale international drug trafficking; and providing assistance and financing to members of al Qaeda and its affiliated organizations and their operatives.  The CW also represented to the defendants that the monies sought to be transferred were the proceeds of, or related to drug trafficking, terrorist financing, and trafficking in contraband cigarettes.  In numerous conversations with S. RANJHA, the CW indicated that some of the monies he was seeking to transmit through the hawala system were being passed on to, or used to benefit, his al Qaeda associates and their cause.

4.      All of the CW's money transfers were arranged by S. RANJHA under the guise of his money transmitter business in Washington, D.C. called HAMZA, INC., d/b/a Pak American Money Transfer (hereinafter "HAMZA").  Four of the transfers took place at the HAMZA office in Washington, D.C.  The remaining exchanges took place at locations in Laurel, Maryland, primarily

---

[1] A "hawala" is an informal money transfer system utilizing a network of persons and/or businesses to facilitate the transfer of monies across domestic and international borders without reliance upon conventional banking systems and regulations.  Such transfers involve handing over monies to an individual in the United States, who, in turn, arranges for the equivalent amount of monies, minus commissions, to be paid back outside of the United States to an individual, or financial account, as designated by the person seeking to have the currency transferred.

the Gourmet Shish Kebab restaurant.  Since at least March 30, 2001, HAMZA has been licensed, pursuant to 26 D.C. Code § 26-1002, to conduct a money transmission business within the District of Columbia and remit funds to locations outside of the United States.  Muhammad SAQI is an office manager at HAMZA.  Imdad RANJHA (hereinafter "I. RANJHA") is the Corporate Vice President of HAMZA.[2]  Neither HAMZA, nor its officers, managers, key shareholders, or authorized delegates, are licensed, as required by Maryland state law - 12 Md. Code Ann., Financial Institutions, § 12-405 - to conduct a money transmission business within the State of Maryland.

5.    The CW, who is a native of Pakistan, plead guilty over twenty years ago to participating in a heroin importation scheme.  Although the CW was facing possible deportation at that time, he was allowed to stay in the United States in order to cooperate with Customs and DEA officials in connection with ongoing investigations.  Since that time, the CW has worked periodically as a paid informant for ICE.  He is under an order of supervision issued by Legacy Immigration and Naturalization Service, and has an application pending for an S-Visa.  Throughout the course of his cooperation, the CW has provided proven and reliable information to federal law enforcement authorities.  In addition, he has testified as a government witness in cases prosecuted in federal court. To date, the CW has been paid approximately $150,000 in connection with his services to law enforcement.

6.    All of the meetings and most, if not all, of the phone conversations between the CW and the subjects of this investigation have been recorded, with the exception of conversations occurring in Canada where recording is not allowed.  The conversations were primarily in a foreign

---

[2]  According to licensing records on file with the District of Columbia, S. RANJHA's wife, Rubina Ranjha, is the Corporate President for HAMZA.

3

language, either Punjabi or Urdu. The vast majority of the recorded conversations have been transcribed and translated by FBI interpreters. Unless noted otherwise, all excerpts of the recorded conversations referenced herein are taken from the English language translations of the conversations. All meetings involving the CW and the subjects of the investigation were surveilled by law enforcement agents, and the CW was searched for contraband before and after each meeting with negative results.

## I.    SEARCH LOCATIONS

7.    This affidavit is being submitted in support of search and seizure warrants for the following locations and bank accounts:

a.    <u>249 11th Street, N.E., 2nd Floor, Washington, D.C.</u> - This is the residence of Saifullah RANJHA and business office for HAMZA. In the past, the address for this location has also been referred to as 800 C Street, N.E., 2nd Floor, Washington, D.C. The location is described as a white colored brick two-story dwelling with blue colored shutters located at the southeast corner of 11th and C Streets, N.E., Washington, D.C. The first floor of the location is occupied by unknown individual(s) not associated with S. RANJHA or HAMZA. The second floor serves as both S. RANJHA's residence and the HAMZA office. The second floor residence/business is accessible via a metal stairway located in the rear, or extreme, southern portion of the dwelling. This stairway ends on the second floor at S. RANJHA's residence/business. Utility records indicate that electric service for this location is listed in the name of Saifullah A. Ranjha. The location is rented by S. RANJHA.

b.    <u>Bank of America Checking Account, Number 4124536016</u> - This account is in the name of Hamza, Inc., at 249 11th Street, N.E. 2nd floor, Washington, D.C. The balance as of

September 11, 2007, was approximately $98,006.

   c. Bank of America Checking Account, Number 4124535978 - This account is in the name of Hamza, Inc., d/b/a Pak American, at 249 11th Street, N.E., 2nd Floor, Washington, D.C.  The balance as of September 11, 2007, was approximately $18,649.

   d. Bank of America Checking Account 4466194077 - This account is in the name of Saifullah A. Ranjha at 249 11th Street, N.E., 2nd Floor, Washington, D.C.  The balance as of September 11, 2007, was approximately $9,501.

   e. Provident Bank Certificate of Deposit 99525479 - This account is in the name of Hamza, Inc., at 249 11th Street, 2nd Floor, Washington, D.C.  The balance as of June 30, 2007, is approximately $70,500.

   f. Citizens National Bank (now known as PNC Bank) Checking Account 1462055 - This account is in the name of Saifullah A. Ranjha.  The balance as of September 18, 2007, is approximately $45,930.

   i. Wachovia/First Union Bank Checking Account 1010113254101 - This account is in the name of Saifullah A. Ranjha.  The balance as of September 18, 2007, is approximately $702.

   j. 2004 blue Toyota Camry, VIN 4T1BE32K94U874559, MD Registration CD9-120 - This vehicle is listed in the name of Saifullah Anjum Ranjha at 249 11th Street, N.E. in Washington, D.C.

   8. The information contained herein is based upon your Affiant's personal knowledge and belief and upon information obtained from other sworn law enforcement officers, public records, subpoenaed documents and other sources of information, including confidential informants.  During

his career as a trained investigator, your Affiant has had occasion to debrief confidential informants and witnesses that had personal knowledge and information as to the manner and method by which criminals launder funds.  Based on these debriefings and your Affiant's personal experience in the course of his own investigations, your Affiant knows that it is common for those who engage in money laundering activities to do the following:

       a.      maintain currency and evidence of financial transactions relating to obtaining, transferring, secreting, and or expending monies acquired by illegal means, in secure locations such as their residence, vehicles, places of business, "stash houses," and/or self storage lockers, the latter of which are maintained in order to avoid detection by law enforcement;

       b.      maintain within their premises, vehicles, places of business, safe deposit boxes, "stash houses," and/or self storage lockers, records of prior financial transactions and books and papers containing names, addresses, telephone numbers of customers, financial supply sources, and other co-conspirators and associates;

       c.      maintain within their premises, vehicles, places of business, safe deposit boxes, "stash houses," and/or self storage lockers, photographs that are taken of themselves, co-conspirators and associates, assets, and financial-related proceeds;

       d.      maintain within their premises, vehicles, places of business, safe deposit boxes, "stash houses," and/or self storage lockers, records of transportation on/in commercial carriers, private cars, and through mail carriers to and from their fund source and distribution points;

       e.      utilize electronic devices including computers, facsimile machines, telephone answering machines, cellular telephones, and digital and text contact pagers to communicate and record transactions with their co-conspirators, which devices often contain electronic

address/telephone books that the subjects use to store the names and telephone numbers of their co-conspirators;

       f.     place assets in names other than their own, including nominees, such as family members, friends, businesses, and business associates, in order to avoid detection of these assets by law enforcement, all the while continuing to use said assets and exercise dominion and control over them;

       g.     acquire and maintain certified false identity documents to conceal their asset ownership and to conceal other  movement and/or activities in furtherance of the criminal activities;

       h.     maintain on hand large amounts of currency in order to operate and finance their ongoing criminal activities;

       i.     utilize foreign and domestic banks and their attendant services, securities, cashier's checks, money orders, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts in order to legitimize and conceal large amounts of cash obtained to further, or proceeds or, their criminal conduct, and if off-site locations are used, maintain and use safe deposits box keys, records and receipts, as well as records, receipts, and/or documents about self storage lockers, mail pickup and telephone answering services.

## II.    INVESTIGATIVE EVIDENCE

       9.     The CW learned of S. RANJHA through his interaction with Mohammad Riaz Gujjar and Muhammad Ashraf.  Gujjar and Ashraf are named defendants in a separate federal bribery and racketeering indictment, also currently under seal, arising from a related sting operation utilizing the same CW.  In October 2003, the CW had a number of discussions with Gujjar regarding who might be able to move the CW's purportedly illegal monies out of the United States without the funds

being traced back.  Gujjar represented that there was a "money guy" in D.C. who could handle the CW's business.  He directed the CW to Ashraf, who provided the CW with S. RANJHA's telephone number.

10.     The CW first met S. RANJHA on December 4, 2003, at the HAMZA office in Washington, D.C.  During the ensuing conversation, the CW made it clear that he did not want his name on anything associated with the transfer of his monies.  He stated that his money was "no good."  S. RANJHA indicated that this was not a problem.  S. RANJHA told the CW that they should keep their future conversations secret.  In the conversation following that first meeting, the CW reiterated that he did not want his name tied to the money that was sent out.  S. RANJHA said it would not be a problem, and he did not want to do that anyway because the FBI would knock on the CW's door.

11.     S. RANJHA was the primary point of contact for the CW for the numerous money transactions that occurred following that first meeting.  All of the transactions, both here in the United States and at overseas locations, were surveilled by law enforcement agents.  In the case of each money transfer, S. RANJHA would receive currency from the CW in Maryland or D.C., and then make arrangements for the equivalent amount of monies, minus fees, to be deposited into the CW's designated foreign bank accounts, or to be delivered outside of the United States to the CW or his designated representative.  In return for conducting the money transfers, S. RANJHA kept five percent of the total amount of currency sought to be transferred on each occasion by the CW.  S. RANJHA's foreign associates who were involved in each of the money transfers kept an additional three to five percent of the total amount for each transaction.

12.     In those instances where cash monies were to be picked up in a foreign country, S.

RANJHA would give the CW information about who he (the CW), or his designated representative (either unwitting participants or law enforcement officers), would meet in whatever county they agreed on - be it England, Spain, Canada, Pakistan or Australia. On many occasions, S. RANJHA provided the CW with dollar bills upon which he wrote contact information, or referenced the serial numbers on the bills as codes for the CW to present to S. RANJHA's foreign contacts at the time of the money pick-ups.

13.    On a number of occasions, the CW requested that monies be transferred into overseas accounts. Undercover accounts were set up by ICE to receive the transfers. S. RANJHA subsequently arranged for transfers into the CW's accounts in: Montreal, Canada; Tokyo, Japan; and Sydney, Australia. In the case of deposits into the CW's Canadian account, S. RANJHA told the CW that he could not transfer the entire amount of the currency provided to him because it would arouse suspicion.[3] S. RANJHA relied on Mazhar CHUGHTAI to structure deposits into the CW's Canadian account in amounts under $10,000 in order to avoid detection or suspicion by the financial institutions or law enforcement. On numerous occasions, surveillance officers in Canada observed CHUGHTAI going in and out of bank branch offices on the same date as recorded deposits of monies into the undercover account in Canada.

14.    Deposits into the CW's accounts in Australia and Japan were completed through wire transfers. A review of bank records confirmed that wire transfers into the CW's Japan account were initiated by CHUGHTAI's money transmission business in Montreal called Pak Exchange Services,

---

[3] Your Affiant has been advised by Canadian law enforcement authorities that Canada has a requirement similar to that embodied in 31 U.S.C. § 5313(a) and 31 C.F.R. § 103.22 that obligates financial institutions to report transactions involving payment, receipt or transfer of currency over $10,000.

and a money transmission business run by his brother, Maqsood Chughtai, known as Pak Canadian Foreign Exchange in Toronto.

15.    The CW's first hawala transaction with S. RANJHA occurred on January 20, 2004. At that time, the CW provided $13,000 to S. RANJHA and requested that the equivalent amount of money (minus fees) be deposited into an account in Canada. S. RANJHA proceeded to obtain a phone number for CHUGHTAI in the CW's presence. He then made a call to that number and began discussing the specifics of the CW's hawala transfer with the individual on the other end. (The number was later determined to be subscribed to CHUGHTAI.) S. RANJHA subsequently provided the CW with CHUGHTAI's number in Canada to call in connection with the Canadian transfers. Your Affiant has reviewed pen register and toll records, which establish contacts between phones associated with S. RANJHA and CHUGHTAI occurring around the time of the CW's requested hawala transfers into the undercover accounts in both Canada and Japan. In explaining his relationship to CHUGHTAI, S. RANJHA told the CW that he (S. RANJHA) has a lot of assets tied up in Pakistan that belonged to CHUGHTAI and his brother.

16.    Beginning with that first transaction in January 2004, and continuing through November 2005, S. RANJHA and CHUGHTAI coordinated the transfer of monies into the CW's Canadian account in connection with nine separate hawala transactions. In the case of one of those transactions, CHUGHTAI provided some of the hawala currency directly to the CW's designated representative. Two additional transactions were completed by CHUGHTAI providing the hawala currency directly to the CW during meetings in Montreal.

17.    Defendants MUHAMMAD and SANDHU were two of S. RANJHA's international contacts in Spain (Barcelona and Madrid, respectively). At the time the CW received his hawala

currency from the foreign coconspirators, including MUHAMMAD, SANDHU, and CHUGHTAI, he advised each of them of the nature of his illegal businesses and the fact that his monies were related to his drug trafficking and other illegal activities.

18.    Throughout the course of this investigation, the CW represented himself to be from the Afridi tribe in Pakistan and the mountainous border region between Pakistan and Afghanistan. Based on his training and experience, your Affiant knows that al Qaeda operatives are believed by international law enforcement to be in this mountainous border region. The CW has also advised your Affiant of this fact, which he knows based on his own experience and familiarity with the area as a Pakistani national. The CW has also advised your Affiant that members of the Afridi tribe are well known among Pakistanis as a group engaged in many illegal activities, including black marketeering, smuggling and drug trafficking.

19.    To date, S. RANJHA and his associates have engaged in a total of eighteen hawala transactions with the CW as set forth below. The co-defendants listed with S. RANJHA in the chart below participated in the particular transaction by either: accepting the CW's currency; contacting the CW to advise him of the progress of the transaction; discussing the specifics of the transaction with the CW either in person or on the phone; arranging for, or depositing, monies into the CW's accounts; and/or delivering the hawala currency outside of the United States to the CW or his designee. In two instances, specifically in February and May 2006, the hawala transactions were unable to be completed due to lack of available cash overseas, and S. RANJHA had to return to the CW a portion of the monies initially sought to be transferred. Beginning in March 2005, S. RANJHA drove his 2004 blue Toyota Camry, Maryland registration CD9-120, to his meetings with the CW in Maryland to pick up currency.

| Defendant(s) | Amount of Funds Given | Location Where Funds Retrieved |
|---|---|---|
| Saifullah RANJHA Mazhar CHUGHTAI | 1/20/04 - $13,000 given to S. RANJHA in Laurel, MD | 1/20 - 1/22/04 - 5 deposits in Canada totaling 14,945 CAD into undercover bank account in amounts under 10,000 |
| Saifullah RANJHA Mazhar CHUGHTAI | 2/5/04 - $50,000 given to S. RANJHA in Laurel, MD | 2/12 - 2/19/04 - 14 deposits in Canada totaling 58,425 CAD into undercover bank account in amounts under 10,000 |
| Saifullah RANJHA Mazhar CHUGHTAI | 3/22/04 - $100,000 given to S. RANJHA in Laurel, MD | 3/24/04 - 83,980 CAD given by CHUGHTAI in Canada to CW's designated representative<br><br>4/1/04 - 4/5/04 - 6 deposits in Canada totaling 32,850 CAD into undercover bank account in amounts under 10,000 |
| Saifullah RANJHA Mazhar CHUGHTAI | 5/5/04 - $100,000 given to S. RANJHA in Laurel, MD | 5/10 - 5/17/04 - 4 wire transfers totaling $91,955 into undercover bank account in Japan initiated by Pak Canadian and Pak exchange in Canada |
| Saifullah RANJHA | 6/22/04 - $280,000 given to S. RANJHA in Laurel, MD | 7/2/04 - £138,670 picked up in London, England, by CW's designated representative |
| Saifullah RANJHA Mazhar CHUGHTAI | 8/19/04 - $100,000 given to S. RANJHA in Laurel, MD | 8/23 - 8/31/04 - 4 wire transfers totaling $91,935 into undercover bank in Japan account initiated by Pak Canadian and Pak Exchange in Canada |
| Saifullah RANJHA Imdad RANJHA Mazhar CHUGHTAI | 9/3/04 - $200,000 given to S. RANJHA in Laurel, MD in presence of I. RANJHA | 9/9/04 - 233,700 CAD given to CW in Canada by CHUGHTAI |

| **Defendant(s)** | **Amount of Funds Given** | **Location Where Funds Retrieved** |
| --- | --- | --- |
| Saifullah RANJHA<br>Muhammad SAQI<br>Imdad RANJHA<br>Mazhar CHUGHTAI | 10/6/04 - $20,000 given to I. RANJHA and SAQI at HAMZA office | 10/8 - 10/13/04 - 5 deposits in Canada totaling 21,860 CAD into undercover bank account in amounts under 10,000 |
| Saifullah RANJHA<br>Mazhar CHUGHTAI | 1/19/05 - $150,000 given to S. RANJHA in Laurel, MD | 1/25 - 3/1/05 - 23 deposits in Canada totaling 156,749 CAD into undercover bank account in Canada; 22 of 23 deposits in amounts under 10,000 |
| Saifullah RANJHA<br>Muhammad SAQI<br>Mazhar CHUGHTAI | 3/10/05 - $65,000 given to S. RANJHA at HAMZA office | 3/16/05 - 74,750 CAD given in Canada by CHUGHTAI's associate to CW and undercover officer after conferring with CHUGHTAI on phone |
| Saifullah RANJHA | 6/1/05 - $300,000 given to S. RANJHA in Laurel, MD | 6/22 - 6/24/05 - total of £145,350 picked up in London, England, by CW's designated representative |
| Saifullah RANJHA<br>Muhammad SAQI | 7/28/05 - $30,000 given to S. RANJHA in presence of SAQI at HAMZA office | 8/12/05 - 1,638,750 rupees picked up in Pakistan by CW's designated representative |
| Saifullah RANJHA<br>Muhammad SAQI<br>Mazhar CHUGHTAI<br>Anar MUHAMMAD | 10/19/05 - $150,000 given to S. RANJHA in Laurel, MD | 10/26/05 - €71,200 given by MUHAMMAD to CW in Barcelona, Spain<br><br>10/25 - 11/1/05 - 6 deposits in Canada totaling 30,800 into undercover bank account in Canada in amounts under 10,000<br><br>11/8/05 - £10,030 picked up in London, England by CW's designated representative |

13

| Defendant(s) | Amount of Funds Given | Location Where Funds Retrieved |
|---|---|---|
| Saifullah RANJHA<br>Anar MUHAMMAD<br>Parvez SANDHU | 1/19/06 - $150,000 given to S. RANJHA in Laurel, MD | 2/1/06 - €35,625 given by SANDHU to CW in Madrid, Spain<br><br>2/10/06 - €20,000 given by MUHAMMAD to CW in Barcelona, Spain |
| Saifullah RANJHA | 4/5/06 - $250,000 given to S. RANJHA in Laurel, MD | 5/4 - 5/9/06 - total of €126,385 picked up in London, England, by CW's designated representative |
| Saifullah RANJHA<br>Anar MUHAMMAD | 4/21/06 - $100,000 given to S. RANJHA in Laurel, MD | 5/10/06 - €55,000 given by MUHAMMAD to CW in Barcelona, Spain |
| Saifullah RANJHA | 2/20/07 - $100,000 given to S. RANJHA in Laurel, MD | 3/30 - 4/10/07 - 3 wire transfers totaling 106,400 AUD into undercover bank account in Australia from business in United Arab Emirates |
| Saifullah RANJHA | 7/26/07 - $50,000 given to S. RANJHA at HAMZA office in presence of SAQI | 8/7/07 - 1 wire transfer of 50,815 AUD into undercover bank account in Australia from business in United Arab Emirates |

20.     The following paragraphs summarize selected recorded conversations between the CW and S. RANJHA, I. RANJHA and SAQI.  Statements in quotations are taken directly from the transcripts of the conversations.  These conversations reflect both the CW's representations regarding his allegedly illegal activities and illicit monies, and the defendants' statements and actions in response.

21.     On March 18, 2004, the CW made a reference over the phone to S. RANJHA about

14

the pilots who brought heroin.  S. RANJHA admonished the CW not to discuss this on the phone.

22.    On May 5, 2004, the CW met with S. RANJHA to deliver $100,000.  S. RANJHA said he does not drive a Mercedes or BMW so no one looks at him.  He expressed concern about monies being traced back to an American account, and told the CW that he must not have anything that can be traced back.  During this conversation, the CW said his money (to be transferred) was from the sale of a kilo of heroin.

23.    During a meeting on July 8, 2004, S. RANJHA admonished the CW not to send representatives in other countries who were "shaky" and like "jelly" to pick up money.  In discussing issues with carrying large amounts of cash, S. RANJHA said that he is always prepared with paperwork, such as a million dollar deposit slip, so he can show that to explain why he is carrying large amounts of cash.[4]

24.    On August 19, 2004, the CW met with S. RANJHA to deliver $100,000.  The two men discussed the CW's smuggling of weapons in the Pakistani black market.  S. RANJHA said he thought the weapons were cheap on the black market.

25.    On September 3, 2004, both S. RANJHA and I. RANJHA met with the CW to receive $200,000.  The CW talked about bringing cocaine in from Columbia and that he kept the coke and heroin parts of his operation separate.  He referred to the "Spanish side" when talking about cocaine.

---

[4]    S. RANJHA was stopped by the Maryland State Police on September 11, 2004, and found to be in possession of $40,000.  He produced paperwork associated with HAMZA and claimed that the monies were related to his money transmission business.  The stop resulted from conversations intercepted over a wiretap on S. RANJHA's phone that had been authorized by the Honorable Marvin J. Garbis of the United States District Court for the District of Maryland. Based on a review of the conversations preceding the stop, the monitoring agents determined that Ranjha was going to various locations to pick up large quantities of money.  Following the traffic stop, S. RANJHA was intercepted assuring various individuals that he had taken care of things with the law enforcement officers by providing them with business-related paperwork.

15

26.    On October 6, 2004, the CW met with SAQI and I. RANJHA at the HAMZA office. The CW spoke to SAQI about his black market operation and how cocaine goes to the black market from Spanish countries and then comes back to the United States.  SAQI says he knew about that. The CW gave $20,000 to I. RANJHA and said that he had not yet given money for one kilo of cocaine to his guy.  The CW stated that he had problems with the money from the last transaction and complaints from his guy for a kilo of cocaine.  The CW told both SAQI and I. RANJHA that he is making money now from his "poppy season" and pointed to an article in the Washington Post about drugs in Afghanistan.  A number of days after this meeting, I. RANJHA  called the CW to tell him the money had been transferred.  This was subsequently confirmed in a phone call from SAQI, who told the CW the amount of Canadian currency that had been put into the CW's Canadian account.

27.    On January 19, 2005, the CW met with S. RANJHA to give him $150,000 for a hawala transaction in Canada.  He told S. RANJHA to speak to CHUGHTAI about the CW's business with al Qaeda and Musharraf so that CHUGHTAI was not afraid.  S. RANJHA said that he would, but it was CHUGHTAI's brother who had a problem, so they (meaning S. RANJHA and CHUGHTAI) were trying to keep this aspect of the business secret.  The CW told S. RANJHA that $65,000 of his money (in the transaction) was important because it was going to "our al Qaeda brothers."  The CW indicated that the recipient of the money was in Zurich.

28.    In a phone conversation on February 8, 2005, the CW gave S. RANJHA directions on where he could deposit the money for al Qaeda by referring to it as money that is "already in Zurich for disbursement."  S. RANJHA asked,  "the one (meaning money) which is already in Zurich for disbursement, shall we transfer that too?"

29.    On March 8, 2005, during a meeting with S. RANJHA and SAQI at the HAMZA office, the CW said that he was taking drugs from Canada and Japan - specifically cocaine from Canada.  The CW got into specifics about how the drugs were shipped.  When S. RANJHA asked where the CW's contact was to whom the hawala money should be given, the CW said, "He is in Montreal, but the people I am giving the money to are not associated with drugs.  It is for our Taliban people.  He does not have much knowledge about it.  I do not want them to be introduced."

30.    On March 16, 2005, after discussions with CHUGHTAI on the phone in Canada, the CW and an RCMP undercover officer met with one of CHUGHTAI's associates, who identified himself as "Ishaq."  After the CW spoke with CHUGHTAI on the phone to confirm with whom he was meeting, Ishaq advised the CW in Urdu that what they were doing was not a legal business and that they rotated among ten different people to handle the transactions.  The CW turned to the RCMP officer and told him in English that Ishaq just stated that "the money is illegal" and he (Ishaq) "can't talk about it."  (This conversation was not recorded and the summary above is based on written statements of the CW and undercover officer made immediately after the meeting.)

31.    On May 3, 2005, during a meeting with S. RANJHA, the CW stated that his money was stuck in London.  He said, "we had mountain people's money, I mean al Qaeda money. Secondly, it was our business money ... because of hawala mistake, it got stuck there" (referring to delays in their hawala transfers).  The CW continued that the person who was "in charge" of the money had a kidney operation in London and they were instructed to hold the money.  The CW said that they had a person in Barcelona, and asked if S. RANJHA could transfer $300,000 there.  S. RANJHA said that he has a "strong" connection in Zurich to do the transaction.  The CW said, "our merchandise has also arrived there. I mean the other kind ... al Qaeda and all.  Those are good

people.  Their person got sick.  I heard there is a person here and his name is ... Badsha Khan.... He

also sends money to those people that I heard" (referring to al Qaeda).  S. RANJHA offered to look

into arranging for the transfer of monies to either Zurich or Spain.  The CW said that he was told that

the person in the hospital had a kidney transplant and he (the CW) was asked "to look if could

arrange a person in Spain" (meaning a person for a hawala transaction).  S. RANJHA said, "I will

look into it ... I do have a person, but I have to determine if he could handle it."  S. RANJHA

cautioned the CW about how dangerous it is to use cell phones because of the possibility of things

being recorded.

      32.    On June 1, 2005, the CW gave S. RANJHA $300,000 and told him that it was drug

money belonging to an associate in London.  The CW stated that transfer of his al Qaeda money

might still happen the following week: "Okay, the other thing is that may be - if possible ... because

my al Qaeda man who went to Spain - so maybe - this 300 you brought - maybe next week (referring

to the $300,000) ... You have been given plenty of time.  If they give me the okay next week, then

140 from this - for them.  If it is possible.  Otherwise the entire amount is for London."  S. RANJHA

asked, "140 for where?  The other man ...?"  CW responded, "The one from before - the one who

is sick.  The al Qaeda people.  The one who is in Spain.  He has gone to Madrid."  S. RANJHA

asked, "If talks go well then 140 has to be given to someone else?"  The CW replied, "It has to be

given in Spain."  The CW was requesting that 140,000 of the $300,000 he had given S. RANJHA

be transferred to the CW's al Qaeda people in Spain.

      33.    On June 9, 2005, S. RANJHA left a phone message for the CW that Madrid is bad

at the moment for money transfers and recommended that the CW's requested hawala of $140,000

occur in Barcelona instead.  He said, "Baba, there are problems in the city that we talked about.  The

conditions are not good in that city and it is better to take precautions. The other city is a good place. You can take a trip to Barcelona for sight-seeing, and many people go there for that. It will be better if you go there instead. There are problems in the other city and conditions are unfavorably bad. It is better to take precautions."

34.    On June 10, 2005, the CW called S. RANJHA to concur in switching locations for the hawala to Barcelona. The CW asked, "Is it hot or cold?" S. RANJHA replied, "So far it is hot, Baba" and then laughed. The CW stated that he had also gotten information that Madrid was "hot." S. RANJHA agreed that there were "lots of problems." Your Affiant learned that shortly after this conversation, on June 15, 2005, sixteen people were arrested in Madrid as a result of a number of terrorism-related raids.

35.    On July 13, 2005, the CW met with S. RANJHA and SAQI at the HAMZA office. The CW told them that the people in London claim that "...our people...the al Qaeda people have been eliminated" (referring to the recent London bombings). After some additional discussion about the situation, the CW said, "...the people of London were arrogant. They were arrogant - no one can touch us." S. RANJHA replied, "When a man is ready to sacrifice his life, no one can stop him." SAQI agreed and said, "Al Qaeda can't be eliminated." Both SAQI and S. RANJHA stated that things are not good in Iraq and Afghanistan. S. RANJHA asked the CW, "where is the baba? We should not utter his name." (After the meeting, the CW advised your Affiant that he understood S. RANJHA to be referring to Usama bin Laden.) The CW said, "Ah, I don't care ...he is in my area. I will have you meet with him." SAQI said Musharraf (Pakistan's President) knows where (bin Laden) is. S. RANJHA asked the CW if Musharraf protects "him" (meaning bin Laden). S. RANJHA also asked the CW how suicide bombers are made ready for their missions. The CW

19

replied, "they attach a bomb with their body and just go." As he is left the meeting, and outside of SAQI's presence, the CW told S. RANJHA that "they (referring to al Qaeda) will make another explosion in London."

36.    On October 5, 2005, the CW met with SAQI at the HAMZA office. SAQI told the CW that all of the transfers in their business are legal because of strict laws. He stated that they normally do not get into the illegal business, but are doing it for the CW because of trust. The CW told SAQI that his London associate was transferring Afghani arms and ammo through Kashmir.

37.    On December 6, 2005, the CW met with SAQI and S. RANJHA at the HAMZA office. He told them that he was making $100,000 per kilo. SAQI asked the CW what legal business he had - the CW said none. SAQI also asked the CW questions about his drug business. During this conversation, the CW said he needed to move funds through Australia. S. RANJHA cautioned the CW again not to say too much on the office phone.

38.    On January 19, 2006, the CW met S. RANJHA to give him $150,000. They talked about the CW's black market goods. When S. RANJHA asked the CW where he wanted to pick up his money, the CW responded, "To Spain. All of my - it's all mixed together....All of my goods for al Qaeda - eh - drugs go there - to Spain. The stock is built over there. My luck is better these days." The CW said that his "Bada" go "from Bada to Chechnya to ... Turkey. All the goods for al Qaeda, for Algeria - all are joined. (Your Affiant knows from his training and experience, and from discussion with the CW, that the "Bada" or "Bara" is an area is Pakistan known for black marketeering.) The CW stated, "Now al Qaeda and Chechnya and the rest, their drugs are all going to Spain. And they can't stop it. And the Spanish are involved, baba." S. RANJHA replied, "Don't know how they do it ... United States doesn't even know how they do it." The CW responded,

"(unintelligible) are giving money, baba. This is their's as well. It's everyone. I will have a ball... So make sure - fifty for Madrid (meaning $50,000 hawala) - because it has to go somewhere. Because over there I meet with Algeria al Qaeda group. That's why I'm going there." S. RANJHA responded, "Okay."

39.    On January 26, 2006, the CW met with S. RANJHA to discuss logistics of their upcoming hawala transfers in Madrid and Barcelona Spain. S. RANJHA told the CW that "once he gets the goods (meaning money), then call and leave a message that you ate and all is good." The CW responded with what he would say: "Brother, kabob is really good."

40.    On May 10, 2006, the CW met with MUHAMMAD in Barcelona, Spain, to receive hawala currency. There was a problem with this particular transaction in that S. RANJHA and MUHAMMAD were unable to have the right amount of money available to give to the CW in Spain. In his conversation with MUHAMMAD, the CW stated that he was going to have many problems with the situation because "they are Arabs - bad people... it's (meaning the money) for the al Qaeda group ... the ones who live in Frontier - our people ... There's nothing in this for me."

41.    On February 20, 2007, the CW met with S. RANJHA to give him $100,000 for a hawala transfer to Australia. This conversation has not yet been transcribed. During a debriefing immediately after the meeting with law enforcement agents, the CW indicated that he had represented to S. RANJHA his money constituted drug proceeds for his al Qaeda group. He told S. RANJHA that the purpose of going to Australia was because animal cargo came into Sydney with concealed weapons, uranium for explosives, drugs and other items for al Qaeda. The uranium was left on the boat in Sydney to go to Pakistan; the drugs and weapons were sold. The CW also advised that al Qaeda needs money right now and he plans to send millions in the future.

21

42.    On July 26, 2007, the CW met with S. RANJHA and SAQI at the HAMZA office to provide $50,000 for another hawala transfer to Australia.  This conversation has not yet been transcribed.  During his debriefing by law enforcement agents immediately after the meeting, the CW stated that he told S. RANJHA that his monies were for what he previously discussed with S. RANJHA about "animal cargo."  The CW also had some discussions with SAQI about issues regarding Usama bin Laden, drug dealing and the tribal areas in Pakistan.

III.    FINANCIAL INFORMATION

43.    S. RANJHA failed to file currency transaction reports ("CTRs") as required by 31 U.S.C. § 5313(a) and 31 C.F.R. § 103.22, for any of the monies he received from the CW.  Licensing records from the District of Columbia indicate that S. RANJHA is aware of federal CTR reporting requirements.  He has filed CTRs over the years in connection with the HAMZA remitter business.  According to HAMZA policies and procedures statement on file with the District of Columbia's Department of Insurance, Security and Banking ("DISB"), HAMZA has an "anti-money laundering" policy that lists certain controls to insure that HAMZA is not "targeted by criminals such as money launderers."  Pursuant to this policy, HAMZA requires that its customers open informational accounts with government issued identification.  It also states that for transactions over $10,000, the customer must provide, among other things, a social security number, business/occupation information, date of birth, and on whose behalf the transaction is being conducted.  The policy requires maintaining copies of all CTRs, suspicious activity reports ("SARs") and other supporting documents for a period of five years.  Every transaction must be in writing.  There is also discussion of being aware of customer efforts to structure transactions.

44.    None of these policies and procedures were followed by S. RANJHA, I. RANJHA,

SAQI or HAMZA with respect to the CW's transactions, as there is no record of any CTR or other suspicious activity report filings made in connection with the CW's money exchanges. A query of the Currency and Banking Retrieval System for CTRs that were filed between January 2004 and July 2007 by either S. RANJHA, I. RANJHA or HAMZA/Pak American Money Transfer indicates that six CTRs were filed during this period only by HAMZA. None of the transaction dates on those CTRs corresponds to the money transfers between S. RANJHA and the CW. A review of CTRs filed by Bank of America for the years 2003 through July 31, 2007, with either S. RANJHA or HAMZA as the owner/transactor indicates the following[5]: a) 2003 - 175 CTRs totaling $3,694,206; b) 2004 - 166 CTRs totaling $4,652,463; c) 2005 - 152 CTRs totaling $4,308,807; d) 2006 - 185 CTRs totaling $5,810,343; and 2007 (through 7/31/07) 116 CTRs totaling $4,555,166. Again, none of these CTRs are related in any way to the transactions between the CW and S. RANJHA and his associates.

45.    A review of Internal Revenue Service records and tax returns filed by HAMZA for the tax years 2004 through 2006 establishes a significant discrepancy between the gross receipts reported by HAMZA as compared to the minimum 5% commission known to be kept by S. RANJHA for each of the hawala transactions he handled for the CW. This is also the case with regard to S. RANJHA's reported gross income for the same tax years:

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| HAMZA Reported Gross Receipts | $104,095 | $102,362 | $108,412 |
| S. RANJHA Wages (reported on personal and corporate returns) | $ 36,060 | $ 25,680 | $ 30,395 |
| 5% Cash Commission from CW hawala transfers | $ 43,150 | $ 34,750 | $ 25,000 |

---

[5] There were no filings for I. RANJHA.

23

Moreover, according to the DISB records, HAMZA employed a graduated schedule of fees for money transfers. The fees started at $10 for the first $2,000 and increased by $10 increments for every additional $1,000 wired, to a maximum of $80 for amounts over $8,000. Thus, S. RANJHA was charging the CW commissions far in excess of HAMZA's stated policy.

46.    Immediately following some of the fund exchanges between the CW and S. RANJHA, mobile surveillance units observed S. RANJHA traveling to banking institutions known to be utilized by him, and then heading south towards Washington, D.C. On other occasions, after S. RANJHA was observed taking money from the CW, surveillance units followed him as he left the area of Laurel, Maryland, and traveled to Route 295, where he headed south towards Washington, D.C.

47.    A review of bank records for accounts specified herein and associated with HAMZA and S. RANJHA  indicate deposits made on the days of the CW's money transfers (and the day just after the exchanges) in amounts far less than the monies provided by the CW. These records also show that S. RANJHA maintains certain balance thresholds, and once these thresholds are exceeded, the excess funds are automatically wire transferred to banks and/or exchange houses in the United Arab Emirates, Pakistan and elsewhere.

48.    The CW has observed computers being utilized at the HAMZA office on those occasions when he has met with S. RANJHA, I. RANJHA or SAQI at that location. HAMZA's policy and procedures statement on file with DISB specifically sites the use of a computer system and software program in connection with the business. Other records provided by HAMZA to DISB in connection with a DISB audit in  the summer of 2005 reflect computer-generated records of wire transfers, invoices, on-line banking, summary charts of money transactions, and an e-mail account.

Given these records, and the CW's observations of computers at the HAMZA office, as recently as July 26, 2007, there is reason to believe that the computer systems currently located at the HAMZA office will contain evidence relating to the transfer of monies provided by the CW and other evidence relating to the crimes charged against S. RANJHA and his associates.

## IV.    CONCLUSION

49.    Based on your Affiant's training, knowledge, and experience, and the facts stated above and information obtained during the investigation, your Affiant states that there is probable cause to believe that S. RANJHA has committed the offense of concealment of terrorist financing in violation of 18 U.S.C. § 2339C(c)(2)(A).  There is also probable cause to believe that  S. RANJHA has also committed, and continue to commit: the crimes of money laundering and conspiracy to do same in conjunction with HAMZA, in violation of 18 U.S.C. §§ 1956(a)(3)(B) and 1956(h); operating an unlicensed money transmission business in violation of 18 U.S.C. § 1960(a); and failing to file currency transaction reports in violation of 31 U.S.C. §§ 5313(a) and 5322(b).  In addition, there is probable cause to believe that within the aforementioned locations the items set forth in Attachment A will be found, all of which constitutes evidence, fruits and instrumentalities of concealment of terrorist financing and the other criminal violations set forth herein.  Therefore, your Affiant requests that this Court issue search and seizure warrants authorizing seizures of the bank accounts set forth herein, which are also listed in the superseding indictment as substitute assets subject criminal forfeiture, and the search of S. RANJHA's residence and business known as HAMZA, Inc., and seizure therein of the items listed in Attachment A.

Your Affiant has signed this affidavit under oath as to all assertions and allegations contained herein and states that its contents are true and correct to the best of his knowledge and belief.

_____
Daniel W. Spotts, Special Agent
Federal Bureau of Investigation

Signed to and sworn before me this _____ day of September, 2007.

_____
United States Magistrate Judge

## ATTACHMENT A

The following items to be seized from 249 11th Street, N.E., 2nd Floor, in Washington, D.C., known as HAMZA, INC. (also referred to as 800 C Street, N.E. 2nd Floor)

1.      Books, records, receipts, bank statements, passbooks, safe deposit keys and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money.

2.      Papers, tickets, notes, schedules, receipts and other items relating to foreign and domestic travel.

3.      Address and/or telephone books and papers reflecting names, addresses and/or telephone number and other contact information of coconspirators, associates, customers and sources of financial supply.

4.      Photographs of coconspirators, associates, assets, and financial-related proceeds.

5.      Electronic devices including telephone answering machines, cellular telephones, and digital and text contact pagers.

6.      Indicia of occupancy, residency, and ownership of the premises described herein, including deeds, utility and telephone bills, and keys.

7.      Identity documents, including passports, alien resident cards, and any related immigration documents or paperwork.

8.      United States currency or other items of value such as jewelry and automobile titles.

9.      All electronic devices which are capable of analyzing creating, displaying, converting, storing or transmitting electronic computer impulses or data, that relate in any way to the items set forth in this section, including, but not limited to, electronic data processing and storage devices, computers and computer systems, all internal and peripheral storage devices, together with systems documentation, operating logs and documentation, software and instruction manuals. The search procedure of the electronic data contained in the computer operating software or memory devices, and/or computer diskettes and data cartridges may include the following techniques:

        a.      surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

        b.      "opening" or cursorily reading the first few "pages" of such files in order to

determine their precise contents;

       c.    "scanning" storage areas to discover and possibly recover recently deleted data;

       d.    scanning storage areas for deliberately hidden files; or

       e.    performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

The person who conducts the search of the electronic computer data shall determine what data is relevant to the subject matter of this warrant. All steps taken in the search of electronic data shall be done in such a manner that preserves the privacy of non-relevant computer data. Unopened electronic mail stored in the computer hard drive may be searched in conformity with the procedures outlines herein.

All of the above constituting evidence, fruits and instrumentalities of concealment of terrorist financing in violation of 18 U.S.C. § 2339C(c)(2)(A), as well as violations of 18 U.S.C. §§ 1956(a)(3)(B) and 1956(h) (money laundering and conspiracy to do same), 18 U.S.C. § 1960(a) (operating an unlicensed money transmission business), and 31 U.S.C. §§ 5313(a) and 5322(b) (failure to file currency transaction reports).